**COURT OF APPEALS
DECISION
DATED AND FILED**

**August 31, 2021**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.    **2020AP333**

**STATE OF WISCONSIN**

Cir. Ct. No.  **2019CV564**

**IN COURT OF APPEALS
DISTRICT I**

ERIK A. ANDRADE,

PETITIONER-APPELLANT,

V.

CITY OF MILWAUKEE BOARD OF FIRE AND POLICE COMMISSIONERS,

RESPONDENT-RESPONDENT.

APPEAL from an order of the circuit court for Milwaukee County: JEFFREY A. CONEN, Judge. *Affirmed*.

Before Donald, P.J., Dugan and White, JJ.

¶1    WHITE, J. Erik A. Andrade appeals the circuit court order upholding the decision of the City of Milwaukee Board of Fire and Police Commissioners (the Board) to discharge him from service as an officer with the Milwaukee Police Department. Because Andrade fails to show that the Board

acted outside of its jurisdiction or did not proceed on the correct theory of law, his claim fails, and accordingly, we affirm.

## BACKGROUND

¶2 This matter arises out of allegations of misconduct by Andrade that came to light after the high-profile arrest of Sterling Brown, a Milwaukee Bucks player, on January 26, 2018. Milwaukee Police Department (MPD) officers used force and shocked Brown with a Taser while taking him into custody for double parking in a disabled parking spot outside a Walgreens store. Andrade answered a call to assist at the scene, but he was not involved in arresting Brown or the use of force. Andrade's contact with Brown included transporting him after arrest.

¶3 On May 24, 2018, MPD internal affairs began an investigation into Andrade's conduct after a city alderperson relayed a screenshot of one of Andrade's Facebook posts to an assistant chief; the alderperson had received the screenshot from an unnamed MPD member. The post stated, "Nice meeting Sterling Brown of the Milwaukee Bucks at work this morning! Lol#FearTheDeer." Internal affairs reviewed the public information Andrade shared on Facebook; although he had several photos in his MPD uniform, none of the posts publicly available could be deemed inappropriate or in violation of the MPD Code of Conduct.

¶4 On June 19, 2018, Brown filed a civil complaint against MPD officers who were at the scene of his arrest; Andrade was named as a defendant. The complaint included images of several of Andrade's Facebook posts as an admission that MPD officers engage in unlawful attacks and arrests of African-Americans without justification or "fear of real discipline."

¶5 On June 28, 2018, MPD internal affairs interviewed Andrade during its renewed investigation into allegations of misconduct that would violate the Code of Conduct for the core values of competence (Core Value 1.00) and integrity (Core Value 3.00). Andrade explained that he shared posts on Facebook with his 1,200 friends. His last profile picture included a badge with a memorial band on it, and he believed that his Facebook friends knew he was an MPD officer. Andrade explained to the investigating sergeant that after Brown's civil action against MPD officers drew national and international media attention, Andrade did not like the portrayal that he was a racist based on his Facebook posts; therefore, he deleted his Facebook account on June 19, 2018, the same day that Brown filed his suit against MPD.

¶6 During his internal affairs interview, Andrade read aloud MPD's Standard Operating Procedure (SOP) § 685.15(A)(5) for social media sites, under the Code of Conduct, Core Value 1.00 for Competency, which states, in part:

> As public employees, members do not lose their rights under the First Amendment of the U.S. Wisconsin Constitution. However, speech on or off duty pursuant to your official duties and professional responsibilities as members of the Milwaukee Police Department is not protected. Members are free to express themselves as private citizens on social networking sites to the degree that their speech is not disruptive to the mission of the department….
>
> ….
>
> Members must be aware that their communication on social networking sites can be used by a skilled defense attorney in impeaching testimony and association with their professional duties as a member of the department.

3

¶7 Andrade then complied with the investigator's request to read aloud two sections of the Code of Conduct: Core Value 3.00 on integrity and Guiding Principle 3.01.

> We recognize the complexity of police work and exercise discretion in ways that are beyond reproach and worthy of public trust. Honesty and truthfulness are fundamental elements of integrity. It is our duty to earn public trust through consistent words and actions. We are honest in word and deed….
>
> Our behavior shall inspire and sustain the confidence of our community. Whether on or off duty, department members shall not behave in such a way that a reasonable person would expect that discredit could be brought upon the department or that it would create the appearance of … impropriety or corruptive behavior.

¶8 The investigator then reviewed Andrade's Facebook posts that were at issue in Brown's complaint and in the internal MPD investigation.

- On March 24, 2018, Andrade posted a comment in response to a Channel 58 article titled, "Milwaukee County Supervisor Introduces Policy Against Mass Incarceration." His comment read:

  > It's hilarious when people talk about mass incarceration lmao [laughing my ass off] like wtf [what the fuck] is that? Mostly all the people I deal with at work cannot stay locked up and they should be. Last time I checked, if you don't commit crimes, you don't get incarcerated … but that's hard for people to comprehend.

- On April 16, 2018, Andrade posted a meme[1] composed on the Tide washing detergent logo and the words "SICK AND TIDE OF THESE

---

[1] A meme is "an amusing or interesting item (such as a captioned picture or video) or genre of items that is spread widely online especially through social media." *Definition of meme*, MERRIAM WEBSTER, INC., https://www.merriam-webster.com/dictionary/meme (last visited June 16, 2021).

HOES," with Andrade's words above stating, "What comes to mind when I'm at work and I'm driving down Greenfield Ave. Smh [Shaking my head]." [sic]

- On April 24, 2018, Andrade shared a "Who Wore it Better" meme that compared NBA player Kevin Durant's hair texture to an ice cream cone that had been dipped in chocolate sprinkles. Andrade commented, "Damn … more naps than preschool! Lmao [Laughing my ass off]."

- On May 3, 2018, Andrade responded to a video titled, "Man Fights Police on Milwaukee's North Side 5/2/18." He commented:

> Let's see the whole video now since people are crying police brutality and how officers are beating an innocent black man for no reason. You social media educated fools are too much sometimes. Time after time, people rush into judgment and make comments after seeing a short clip of an incident and all the sudden, you all act like you were there and give expert opinion. Educate yourself on instant before you dummies want to voice your opinion about it.

The video depicted the arrest of a man who was charged with three felony counts of battery to a law enforcement officer after his arrest ended with him and officers going to the hospital for injuries.

- On May 23, 2018, Andrade was tagged in a Facebook post that included the released police body cam video footage of Brown's arrest; the text read "I need your autograph. I spotted you arresting an NBA player, LOL [laugh out loud]." Andrade commented, "I didn't arrest him, LOL." Andrade was also tagged in a shared Facebook post from a local news video titled "Milwaukee Bucks Rookie Stunned, Arrested;" the tagged post read "Erik Andrade let the man get his early morning craving of popcorn." Andrade reacted to the post with a laughing emoji.

- On May 27, 2018, Andrade commented, "A little truth to those who want to listen" on his shared post of a video from Facebook user "Mind of Jamal." The video author's post stated:

    > The epidemic of the black community lying on the police need to be addressed. Yes, whenever something happens, it always a[n] epidemic of racism, police brutality or whatever lie these failed liberal handpicked so-called liberal black leaders come up with this epidemic crap to cover up the fact they have failed the black community.

- On May 31, 2018, Cavaliers' player, J.R. Smith, missed a shot in game one of the NBA Finals between the Cavaliers and Warriors basketball teams; the Cavaliers ultimately lost the game. Andrade posted, "I hope J.R. Smith double parks in Walgreens handicap parking spots when he's in Milwaukee."

- In an undated Facebook post, Andrade stated, "Had a great time workin replacement over in D5 the other day …. 5+ OT and a use of force. Lol." [sic]

¶9     Andrade stated that he did not believe that his posts violated the Code of Conduct. He stated, "some of [his posts] are meant to be jokes; some are like meant to educate and enlighten … maybe give … a point of view." He acknowledged that they could be seen as "unprofessional," but that his "sense of humor" gets him in trouble.

¶10     On August 23, 2018, Milwaukee Police Chief Morales charged Andrade with two violations of the Code of Conduct: count one—Core Value 1.00 for competence referencing Standard Operating Procedures relating to § 685.15(A)(5) for use of social networking sites; and count two—Core Value 3.00 for integrity. On September 12, 2018, Chief Morales issued a Personnel

Order disciplining Andrade. The chief determined Andrade was guilty of count one for "[p]osting content to a social media networking site that was disruptive to the mission" of MPD, and imposed a thirty-day suspension without pay. The chief determined Andrade was guilty of count two for failing "to inspire and sustain the confidence of our community," and discharged Andrade from the department. That same day, Chief Morales notified the Board in an official complaint of the discipline he imposed on Andrade for his misconduct. The next day, Andrade appealed to the Board from the chief's order discharging him from service.

¶11 In November 2018, the counsel retained by Chief Morales to defend his discharge order and Andrade's counsel filed their witness and exhibit lists. Relevant to this appeal, Andrade's counsel named Chief Deputy District Attorney Kent Lovern as a potential witness, along with a "*duces tecum* subpoena for any form/database/record, etc. of the 'no testify' list created and maintained by his office."

¶12 A Hearing Examiner conducted a two-day disciplinary appeal hearing in December 2018 before three commissioners on the Board under the procedure set forth in WIS. STAT. § 62.50(11)-(17) (2019-20).[2] In opening statements, the chief's counsel described the undisputed facts of the case:

---

[2] WISCONSIN STAT. § 62.50(17)(b) sets forth that a police officer may only be discharged, suspended, and reduced in rank if the Board "determines whether there is just cause" and requires the Board to "apply the following standards, to the extent applicable:"

> 1. Whether the subordinate could reasonably be expected to have had knowledge of the probable consequences of the alleged conduct.

> 2. Whether the rule or order that the subordinate allegedly violated is reasonable.

(continued)

> There is no dispute that these posts are posts that Mr. Andrade posted on social media. There is no dispute that they caused great uproar. There won't be any dispute that during the course of the investigation, Internal Affairs consulted with the Milwaukee County District Attorney's Office; in particular, second-in-command, Attorney Kent Lovern … and he advised the—the department that the posts would make it impossible for his office to use Mr. Andrade as a witness in criminal cases because those posts could be used to impeach him, impeach his credibility and the defense lawyers would be able to render him ineffective as a witness. Mr. Lovern went a step further and what he said was, since these posts are now known, they fall into the category called "Brady material" where the DA's office actually has a constitutional obligation to turn them over to defense counsel in every criminal case in which Mr. Andrade would attempt to serve as a witness.

¶13 The chief's counsel continued that Chief Morales reviewed the investigation and the "tenor, tone and content of the posts" were problematic

---

> 3. Whether the chief, before filing the charge against the subordinate, made a reasonable effort to discover whether the subordinate did in fact violate a rule or order.
>
> 4. Whether the effort described under subd. 3. was fair and objective.
>
> 5. Whether the chief discovered substantial evidence that the subordinate violated the rule or order as described in the charges filed against the subordinate.
>
> 6. Whether the chief is applying the rule or order fairly and without discrimination against the subordinate.
>
> 7. Whether the proposed discipline reasonably relates to the seriousness of the alleged violation and to the subordinate's record of service with the chief's department.

A disciplinary hearing consists of Phase I, which considers the first five just cause standards in WIS. STAT. § 62.50(17)(b), and if the Board concludes those are satisfied, it moves on to Phase II, to consider the sixth and seventh standards.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

because of "the racial nature, the insultive nature, the belittling and fun-making nature," but the "linchpin on which the discharge rested was Mr. Andrade's inability to serve as a witness in criminal cases … leaving him simply incapable of performing one of the core functions of a Milwaukee police officer."

¶14    Andrade's counsel's opening statement responded to that point, stating that "[t]he inadequacies of the chief's case will be undisputed…. [T]his case really comes down to whether or not Officer Andrade can testify. Guess what? There is nothing about whether or not he can testify in the entire investigation. It is not there."

¶15    Chief Morales testified about the practical meaning of the core value for competence in MPD's Code of Conduct. The chief explained that among the guiding principles of the core value of competence "was familiarity with policy and procedure." He stated this was important because of "lawsuits that occur when we're out of policy." The chief stated it would "absolutely" be disruptive to the mission of the department if an officer engaged in conduct that rendered the officer ineffective as a witness in a criminal case.

¶16    One of the Board commissioners questioned how MPD officers are trained on SOPs. Chief Morales stated that policies are periodically updated; some are given specific training. The officers must electronically acknowledge they have reviewed the policy.

¶17    Andrade's counsel questioned Chief Morales about Andrade's ability to testify, to which the chief responded that it was his "belief that he can't testify." Andrade's counsel asked if that was "different than the DA won't let him testify?" Chief Morales responded, "No. That is the same as the DA won't use him as a witness." The chief testified that Andrade "brought discredit to the

9

department on discipline and as I stated earlier, the purpose of firing him is I can't use him as a witness in court" and that not being able to use him as a witness is "what tipped it over to me making a decision to fire him." Andrade's counsel questioned the chief on his reasons to discharge Andrade:

> [ANDRADE'S COUNSEL:] [Y]ou didn't fire him because he brought discredit to the department. I think your testimony was he only got fired because the DA's position took it over the edge. To bring discredit to the department would have only led to severe discipline. Is that fair?
>
> [CHIEF MORALES:] Yes.
>
> [ANDRADE'S COUNSEL:] Same thing with the second charge. You wouldn't have fired him for failing to inspire and sustain the confidence in our community but for the DA's decision. Is that fair?
>
> [CHIEF MORALES:] That is fair.

¶18 The chief's next witness was a local defense attorney; Andrade's counsel objected to having a defense attorney testify because he did not think his testimony was relevant. Andrade's counsel stated, "There is nothing in the investigation about ability to testify or impeachment...." The Hearing Examiner allowed the defense attorney to testify. The attorney explained that "any competent defense counsel" would be able to impeach Andrade's credibility using the Facebook posts.

¶19 Andrade called adversely a lieutenant in internal affairs. The lieutenant testified that the totality of Andrade's conduct, specifically the social media posts, were evidence to support both charges against him. The lieutenant testified that his office did not specifically consider Andrade's ability to testify in its investigation. He explained that Andrade's ability to testify "was brought in as a consideration by the chief's office as to the discipline."

¶20 The chief called Chief Deputy District Attorney for Milwaukee County, Kent Lovern, who testified that Chief Morales contacted him during the internal affair's investigation into Andrade's Facebook posts and he was asked to review the posts and whether he would in "future criminal prosecutions, call Officer Andrade as a witness for the state in any of our prosecutions." He "concluded that the posts … were damaging enough to Officer Andrade's credibility that we would not use Officer Andrade in future prosecutions handled by the Milwaukee County District Attorney's Office." He concluded that this information would need to be turned over to defense counsel as *Brady*[3] material. Lovern explained that when he examined twelve years of police files, he found

> literally three or four other cases … where we have made a decision that we could not use an officer because the *Brady* material we had to turn over was so overwhelmingly negative, that we felt like it would become a distraction to our prosecution should that officer be a witness for us.

¶21 Andrade's counsel reviewed with Lovern the *Brady*/*Giglio* list, which was produced by the DA's office and contained the names and issues with 116 MPD members. Nine of the MPD members were labeled "do not call" and Lovern stated that Andrade would be included within this subset. A Board commissioner questioned Lovern about what would happen "if an officer is on your 'no-call' list and continues with the Milwaukee Police Department and that particular officer is the investigating officer in a particular case, what would your

---

[3] *Brady* and *Giglio* disclosures refer to *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972). In *Brady*, the U.S. Supreme Court established that a prosecutor has a duty to disclose exculpatory and impeachment evidence even without a formal request by the accused. *Id.* 373 U.S. at 87; *State v. Harris*, 2004 WI 64, ¶12, 272 Wis. 2d 80, 680 N.W.2d 737. In order to establish a *Brady* violation, a defendant must demonstrate that the withheld evidence is favorable and material. *See Giglio*, 405 U.S. at 154; *Harris*, 272 Wis. 2d 80, ¶13.

11

office do … where that is your one and only star witness, but they are on this 'no-call' list?" Lovern replied that such a case would not be prosecuted.

¶22 In closing arguments for Phase I of the hearing, Andrade's counsel argued that the chief's case did not show that just cause standards one through five were proven by a preponderance of the evidence, which was the proper legal standard. Andrade's counsel argued:

> If the issue was the ability to testify, some document, some reference, either in the investigation or in the Complaint, in the Charges and Specifications, in the personnel order, it should say that. Officer Andrade has to be on notice that that is an issue. That is a clear, fundamental due process right.

¶23 The Board met in closed session to deliberate and returned with a unanimous finding that, by a preponderance of the evidence, Andrade violated MPD's Code of Conduct on counts one and two. Further, the Board "found, by a preponderance of the evidence, that the first five just cause standards are satisfied" for counts one and two. Then the Board moved on to Phase II, in which they considered the sixth and seventh just cause standards and the "good of the service." *See* WIS. STAT. § 62.50(17)(a).

¶24 In Phase II, Andrade's counsel called Michael Crivello, an MPD detective and the president of the Milwaukee Police Association (MPA), whose testimony focused on comparable discipline, with exhibits showing that MPA records showed different numbers of officers disciplined for violating the SOP on social media and discharge for violating Core Value 3.00 on integrity.

¶25 When Andrade's counsel questioned Crivello about the other officers involved in the Brown incident and the discipline imposed on them, the Hearing Examiner sustained the chief's objection and stated that "[n]one of those

officers were disciplined for posts—Facebook posts." The examiner explained that when you consider different "conduct resulting in discipline," then you could consider "the entire discipline history of the police department. I just don't think that is what is intended by these comparable type evidence." The examiner determined that unless you are considering similar conduct, it is not relevant because "there can be all sorts of conduct under the rule that is not related to the type of conduct at issue here and there's really no end to the number of cases we can be discussing." Andrade's counsel made an offer of proof[4] and made a record that "the Commissioner has ruled the evidence that Officer Andrade believes is comparable and goes to Just Cause Factor No. 6 will not be allowed to be discussed or put into evidence." The examiner confirmed that was correct.

¶26 At the close of deliberation for Phase II, the Board members decided "unanimously that the discipline of Erik Andrade should be sustained on Count 1 and Count 2, that the good of the service requires Erik Andrade to be suspended for 30 days without pay and terminated…." The Board stated it would provide a "written decision as soon as practicable" and waived the "ten-day rule, Fire and Police Commissioner Rule [XVI] 10(f)."

¶27 The Board issued its written decision on January 4, 2019. It made findings of fact with regard to Andrade's problematic Facebook posts, the media outcry after the Brown arrest became public and Brown filed his civil rights suit against the City, and the MPD investigation into Andrade. It made legal conclusions on each of the just cause standards considered under WIS. STAT. § 62.50(17)(b). The Board concluded that the chief satisfied all seven standards

---

[4] Five exhibits were labeled and not received as evidence.

by a preponderance of evidence. It concluded that "the posts and comments themselves and the public's reaction to them as described in the record are sufficient to establish that a reasonable person would expect that the posts and comments violate" the Code of Conduct. It concluded "that the posts and comments undermined trust in the department, disrupted the mission of the department, undermined public confidence, discredited the department, and created the appearance of impropriety and corruption in the department."

¶28 On January 9, 2019, Andrade filed a notice of appeal to the Milwaukee County Circuit Court to review the Board's decision discharging him, under WIS. STAT. § 62.50(20)-(22). On March 8, 2019, Andrade filed a petition for a writ of certiorari, also challenging the Board's decision. On March 20, 2019, the parties stipulated to consolidating the two cases. The circuit court affirmed the decision of the Board in a written decision in November 2019. Andrade appeals only the certiorari decision because if the Board's decision is sustained in the statutory appeal to the circuit court, "the order of discharge, suspension or reduction shall be final and conclusive in all cases." WIS. STAT. § 62.50(22). Additional relevant facts are included below.

## DISCUSSION

¶29 Andrade argues that the Board violated his due process rights by preventing him from putting forth a full defense and by not giving him notice that his ability to testify for the prosecution in future police cases was an issue. Andrade contends that the circuit court erred when it refused to apply the doctrine of judicial estoppel to bar the Board from taking inconsistent positions in its litigation with him and its litigation with Brown. Finally, Andrade argues the Board exceeded its jurisdiction and lost competency to issue a written decision.

14

¶30 "When reviewing a petition for a writ of certiorari, we review the Board's decision, not the decision of the circuit court." *Vidmar v. Milwaukee City Bd. of Fire Police Comm'rs*, 2016 WI App 93, ¶13, 372 Wis. 2d 701, 889 N.W.2d 443. Our "certiorari review is limited to whether the Board kept within its jurisdiction or applied correct legal theories." *Sliwinski v. Board of Fire & Police Comm'rs of City of Milwaukee*, 2006 WI App 27, ¶12, 289 Wis. 2d 422, 711 N.W.2d 271. We review these questions of law *de novo*. *Vidmar,* 372 Wis. 2d 701, ¶13.

## I.    Due process

¶31 Andrade argues his right to due process was violated when the Board refused to allow him to present a full defense to the charges, specifically by refusing to allow additional comparable discipline evidence. Andrade asserts that the Board improperly limited his right to present evidence to rebut the chief's sixth just cause standard, whether the chief is applying the rule fairly and without discrimination against the officer. WIS. STAT. § 62.50(17)(b)6.

¶32 Andrade argues that he is entitled to the "full panoply of due process protections[.]" *Sliwinski*, 289 Wis. 2d 422, ¶13 (citation omitted). The Board asserts that the fairness of its application of the just cause standards have been fully litigated by the nature of Andrade's statutory appeal before the circuit court; therefore, any analysis of the sixth standard is not properly before this court. *See* WIS. STAT. § 62.50(20). On certiorari review, we may not review whether the evidence showed just cause for his discharge. It is the circuit court that determines "the question of fact presented" on statutory appeal, and the circuit court "shall be limited in the review thereof to the question: 'Under the evidence is there just cause, as described in sub. (17)(b), to sustain the charges against the accused?'"

§ 62.50(21). The circuit court's review is final. § 62.50(22). Accordingly, we limit our analysis to whether the Board considered the correct standard of law and stayed within its jurisdiction.

¶33 The admission of evidence at a disciplinary appeal hearing is vested in the hearing examiner's "reasoned discretion[.]" *Sliwinski*, 289 Wis. 2d 422, ¶15. We will uphold a decision to admit or exclude evidence as long as the examiner applied the proper standard of law.[5] *Id.* The proper standard of law is relevance. *See id.* (citing WIS. STAT. § 904.01[6]). Although there is a superficial commonality that all of the officers' records were impacted by Brown's arrest, the discipline imposed for the other officers' conduct during Brown's arrest was not relevant to the question of the just cause of disciplining and discharging Andrade for his social media posts.[7] Therefore, the examiner's decision was reasonable to exclude evidence of the other officers' discipline. Andrade's right to present a full defense was not unlimited and it did not require the examiner to admit evidence that was not relevant. We conclude that limiting Andrade to offering relevant evidence and testimony did not violate Andrade's right to due process.

---

[5] We note that two Rules of the Board of the Fire and Police Commissioners City of Milwaukee (FPC Rules) apply to the introduction or evidence and testimony. "Trials are quasi-judicial proceedings intended to secure the facts in as direct and simple a manner as possible. Wisconsin Rules of Evidence controlling civil cases will apply, but the Hearing Examiner may relax the rules of evidence to assure that relevant facts are elicited during the trial." FPC Rule XVI § 11(a). "The Board may limit the calling of witnesses or the taking of testimony which appears to be cumulative or lacking sufficient relevance." FPC Rule XVI § 10(c).

[6] "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." WIS. STAT. § 904.01.

[7] Andrade argues that the officers disciplined for arresting Brown brought more discredit upon the department; however, this again misses the Hearing Examiner's point that the Board cannot consider "the entire discipline history of the police department" or else there is "no end to the number of cases we can be discussing."

¶34   Andrade argues that the comparable discipline evidence that the examiner denied admission was relevant.  He argues that the Board must compare the "rule" in the charges, not the conduct in the charges.  *See* WIS. STAT. § 62.50(17)(b)6. ("Whether the chief is applying the rule or order fairly and without discrimination against the subordinate.").   Andrade's statutory interpretation is not persuasive.[8]  The statute calls for the Board to review the chief's application of the rule.  Here, we interpret Andrade to seek to introduce the discipline of officers who violated Core Value 3.00; however, integrity is a very broad category.  We agree with the examiner's conclusion that widening the comparable disciplines could open up comparisons to the entire department if it were not limited by reasonably related conduct.  Further, the Board argues that the statutes and case law do not require MPD or the Board to apply the same discipline to every violation of a particular rule, regardless of the severity or nature of the violation or its collateral consequences.

¶35   Andrade argues that the social media posts were only applicable to count one for violating Code of Conduct, Core Value 1.00 on competence; therefore, the Board erred when it relied on those posts as evidence proving count two.  Andrade contends that because the chief acknowledged that but for the DA's decision that it would not call Andrade as a witness, Andrade would not have been discharged for the Facebook posts alone, and the Board was not considering whether violations of the same rules were receiving fair and consistent discipline. This argument appears to be based on a misapprehension of the complaint—while

---

[8] "The purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110.  If the meaning of the statutory language is plain, we typically end our inquiry. *Id.*, ¶45.

17

it is true that the SOP on social media was referenced in count one, the specific allegations against Andrade in count two were based on him posting "inappropriate, disrespectful and defamatory comments to various memes and videos on his personal Facebook social networking account and shar[ing] them with his Facebook friends." There is simply no way to read the complaint that the charges against Andrade were limited to social media posts in count one and the ability to testify in count two. The Board properly considered Andrade's social media posts when assessing the entirety of Andrade's conduct alleged for both counts. We conclude that the Board employed the proper legal standard in its just cause analysis for discharge for count two.

¶36 Andrade's second due process argument is that he was not on notice that his ability to testify was an issue. He asserts that the complaint against him did not list the ability to testify as a concern related to his continued employment as a police officer for MPD. The Board argues that Andrade was not charged with being unable to testify, instead he was charged with violating the Code of Conduct for integrity, which requires that MPD officers "shall not behave in such a way that a reasonable person would expect that discredit could be brought upon the department." The Board contends that Andrade's social media posts brought discredit upon the department and the posts rendered him vulnerable to impeachment by a defense attorney if he were to serve as a State's witness. The Board argues the fact that Andrade has been deemed unusable as a witness in a criminal case is not an element of the charge against him; it is a consequence of his failure to inspire and sustain the confidence of the community and the harm he has done to the department's mission.

¶37 Andrade argues that the statutory process requires the chief to set forth the reasons for the discharge.[9] He asserts that because his perceived inability to testify was the sole reason for his discharge that should have been contained in the charging document. The record reflects the critical importance of being able to serve as a credible witness as a sworn police officer—Chief Morales and Chief Deputy DA Lovern both discussed it extensively. The chief stated that the ability "to testify in court is a tool that is needed, no different than a firearm." He questioned how an officer who could not use a firearm or who could not testify "be operational or useful for the Milwaukee Police Department?" Lovern testified that Andrade's social media posts would require his office to disclose this evidence as potentially exculpatory in any case in which he served as a witness, per *Brady* and *Giglio*. Andrade's argument fails because the record makes clear that the reason he was discharged was his conduct on social media, conduct that triggered the DA's officer to determine that calling Andrade as a witness would require *Brady*/*Giglio* disclosures and that the DA's office would not call him as witness.

---

[9] We note that the complaint against Andrade does not list an ability to testify as a charge against him; however, the record reflects that Andrade had actual notice that an officer's ability to serve as a credible witness was a concern far before the hearing. First, in Andrade's interview with internal affairs, he was asked to read the subsection of the SOP on social media specifically stating that "Members must be aware that their communication on social networking sites can be used by a skilled defense attorney in impeaching testimony and association with their professional duties as a member of the department." Andrade's interview in August 2018 predated the complaint. Second, his counsel requested Lovern produce his *Brady*/*Giglio* lists under a subpoena *duces tecum* in November 2018 when the parties submitted their exhibit and witness lists before the December 2018 hearing. Having reviewed the hearing transcripts, we reject that Andrade was ambushed by the chief's case against him. Although Andrade disputes that he had notice, he fails to explain why he would request the *Brady* disclosure list if he was unaware that it was a concern.

¶38    Andrade focuses on a perceived unfairness in the proceedings that he was not charged with being unable to testify. He argues that neither Core Value 1.00 nor 3.00 pertained to his ability to testify and internal affairs did not investigate his ability to testify. However, the Board's reasoning in its written decision showed that it relied upon the theory of law within the Code of Conduct, Core Value 3.00 for integrity, in its analysis of count two. The Board concluded that Andrade's posts "managed to repeat every negative stereotype plaguing big city police departments, i.e., racism, use of excessive force, disregard for ethnic sensitivities, distrust of the public, and incurring excessive overtime." The Board concluded "that the posts and comments undermined trust in the department, disrupted the mission of the department, undermined public confidence, discredited the department, and created the appearance of impropriety and corruption in the department." Further, the Board concluded that discharge was a "drastic consequence of Andrade's conduct" but that discharge "underscores the seriousness of the offense."

¶39    As the record reflects, the Board heard substantial testimony that the ability of a police officer to testify is critical. As we explained in another discharge appeal, "[i]f an officer's capacity to work in the field, which includes giving credible testimony in court, has been permanently compromised … then his ability to engage in the full spectrum of the responsibilities of a police officer has also been compromised." *Vidmar*, 372 Wis. 2d 701, ¶20. Andrade's conduct undermined the confidence in the community with regard to his credibility as a witness and discredited the department. We conclude that the Board proceeded on a correct theory of law in concluding that Andrade violated count two for Core Value 3.00.

## II.    *Judicial estoppel*

¶40    Andrade argues that the circuit court erred when it declined to apply the doctrine of judicial estoppel in his statutory and certiorari appeal because the Board has asserted inconsistent positions in litigation with Brown and with him. "Judicial estoppel is an equitable doctrine, generally applied by circuit courts, that 'precludes a party from asserting a position in a legal proceeding and then subsequently asserting an inconsistent position.'" ***Salveson v. Douglas Cnty.***, 2001 WI 100, ¶37, 245 Wis. 2d 497, 630 N.W.2d 182 (citation omitted).  There are three elements required to "invoke the doctrine of judicial estoppel:  (1) the later position must be clearly inconsistent with the earlier position; (2) the facts at issue should be the same in both cases; and (3) the party to be estopped must have convinced the first court to adopt its position." ***Id.***, ¶38.

¶41    Andrade contends that the first element of judicial estoppel is satisfied because the Board took inconsistent positions in the two cases as evidenced by its claim in this case that the Facebook posts about excessive overtime and force amounted to "bragging" and "making fun" of the situation, which Andrade claims is not what was stated in the City's answer in Brown's civil suit in federal court.[10]  Andrade claims that the second element is satisfied because the Facebook posts that were considered racist and inappropriate were used in both cases.  Finally, Andrade argues the third element was satisfied because the City convinced the Board that the Facebook posts were racist and inappropriate.

---

[10] We note that Andrade's suit is against the Board and Brown's suit is against the City of Milwaukee and several officers within MPD.  For the sake of this argument we will accept without deciding that the Board and the City are sufficiently the same entity to consider judicial estoppel; however, Andrade has not established this as a fact.

Ultimately, Andrade claims that by taking a contradictory position in the earlier case with Brown, the Board estopped itself from making the argument that his Facebook posts were racist and inappropriate in this case

¶42 Conversely, the Board argues judicial estoppel would not apply because its positions are not inconsistent between the two cases. For the first element of judicial estoppel, the Board asserts that in both cases the Board and the City maintained that Andrade's social media posts were racist and inappropriate, so its argument was not inconsistent. For the second element, the Board argues that the issues in each case were "radically different." The Board maintains that Brown's case involved a question of whether his arrest was racially motivated, and the question in this case was about whether Andrade's social media posts violated MPD's Code of Conduct. For the third element, the Board argues that because Brown's federal lawsuit against the City and the MPD officers had not concluded by the time Andrade's disciplinary hearing occurred, the federal court could not have been convinced of the City's position. The Board contends it has maintained a consistent position on Andrade's Facebook posts; therefore, the doctrine of judicial estoppel should not be applied to this case.

¶43 Judicial estoppel's primary purpose is to ensure that parties do not play "fast and loose with the judicial system." *State v. Fleming*, 181 Wis. 2d 546, 557, 510 N.W.2d 837 (Ct. App. 1993) (citations omitted). Reviewing the first element, Andrade relied on the City's answer to Brown's federal lawsuit, in which Andrade's Facebook posts were alleged to show that Andrade mocked Brown, shared racist memes, celebrated overtime pay and use of force, and as admissions that he and the other defendant officers "were allowed to engage in unlawful attacks and arrests of African Americans without justification and then relish such events without any fear of discipline." The City denied these allegations (or

22

objected that they were legal conclusions) and asserted that the Facebook postings speak for themselves. The City's answers that the Facebook posts speak for themselves is not a denial that they were inappropriate.

¶44 Although the first element is unlikely to be satisfied, our review of the second element shows that the "facts at issue" are not the same. This case is about Andrade's social media postings that undermined confidence in MPD and in his integrity and Brown's case is about MPD and the officers who allegedly violated Brown's rights during his arrest. The third element is also not satisfied because the City had not convinced the federal court to adopt its position by the time this case was decided by the Board.[11] Ultimately, Andrade has not provided sufficient evidence that the Board's actions in each case satisfy the necessary elements of judicial estoppel. We reject Andrade's claim that the circuit court erred when it denied his claim of judicial estoppel.

### III. *Jurisdictional defect in written decision*

¶45 Finally, Andrade argues that the Board acted outside of its jurisdiction because it lacked competency to issue a written decision. Andrade asserts that the rules require the Board to issue a written decision within ten days. Under the Rules of the Board of the Fire and Police Commissioners City of Milwaukee (FPC Rules), "A written decision will be signed by Board members who participated in the decision within ten (10) days after such decision is

---

[11] Andrade argues that this element is satisfied because the Board adopted the chief's position that the Facebook posts were racist and inappropriate. As the doctrine requires a litigant to maintain the same position it had in a prior suit, we are uncertain why Andrade argues that convincing the Board satisfied this element. He makes no argument about the City convincing the federal court of its position.

rendered and will be forwarded to each of the parties." FPC Rules XVI § 10(f). Andrade's hearing was completed on December 19, 2018, and the Board's written decision was issued January 4, 2019, which equals sixteen days.

¶46 Andrade argues that the Board, as an administrative agency is bound by the rules it enacts and cannot proceed without regard to them. *See Wisconsin DOR v. Hogan*, 198 Wis. 2d 792, 816, 543 N.W.2d 825 (Ct. App. 1995) (explaining that administrative agencies "have only such powers as are expressly granted to them by the legislature, or as may be necessarily implied from the applicable statutes."). However, whether a time limit is mandatory or directory is a question of law that we review independently. *Koenig v. Pierce Cnty. Dep't of Hum.. Servs.*, 2016 WI App 23, ¶39, 367 Wis. 2d 633, 877 N.W.2d 632. Unless there is a mandatory time limit, an administrative agency's "'delay in issuing a decision is not reversible error' on due process grounds." *Id.*

¶47 The Board argues that even if we assumed that it was tardy in issuing its decision, the deadline was directory and did not affect its competency or jurisdiction.

> The neglect of the commission to act within the ten days may furnish occasion for complaint, but as a rule a statute prescribing the time within which public officers are required to perform an official act is merely directory, unless it denies the exercise of power after such time, or the nature of the act, or the statutory language, shows that the time was intended to be a limitation.

*State v. Industrial Comm'n*, 233 Wis. 461, 466, 289 N.W. 769 (1940). The deadline here is not by statute and there is no language in the statute or in the FPC rules that shows that the Board loses jurisdiction over a disciplinary appeal if its written decision is delayed.

¶48 Andrade argues that the Board's unlawful delay in issuing a written decision injured Andrade by delaying his ability to recoup his job and clear his name. Andrade contends that because the Board's delay injured Andrade, the ten day deadline must be considered mandatory. *See Karow v. Milwaukee Cnty. Civ.. Serv. Comm'n*, 82 Wis. 2d 565, 572, 263 N.W.2d 214 (1978) ("But where the failure to act within the statutory time limit does work an injury or wrong, this court has construed the time limit as mandatory."). In *Karow*, the statute set a three-week time limit to hold a disciplinary hearing and the administrative agency promulgated a rule that allowed them to delay the hearing for good cause. *Id.* at 569. Our supreme court concluded that the statutory deadline was mandatory because the appellant was injured. *Id.* at 572. *Karow* is distinguishable for two reasons. First, in contrast to Karow's situation, the statute governing Andrade's discharge requires a written decision, but it does not set a deadline. *See* WIS. STAT. § 62.50(17)(a). Second, Karow petitioned for reinstatement when his pay was suspended during the delay of his disciplinary hearing—the claims against him had not yet been adjudicated by the administrative agency, much less decided. In contrast, Andrade had a hearing and he knew at the end of the hearing on December 19, 2018, that the Board had upheld his discharge. Karow's injury was not being paid while he was awaiting resolution, Andrade's only injury here is a delay in being able to file an appeal.

¶49 Additionally, the statutory construction of timed deadlines would exclude weekends and holidays from the ten day deadline.[12] *See* WIS. STAT.

---

[12] Andrade argues that we should consider the rule to set a ten calendar day requirement and rejects that Board's contention that counting business days would be appropriate. Andrade does not explain why the statute on time in civil actions would not apply in the absence of express direction. *See State v. Pettit*, 171 Wis. 2d 627, 647, 492 N.W.2d 633 (Ct. App. 1992) (explaining we do not develop argument for parties).

§ 801.15 ("When the period of time prescribed or allowed is less than 11 days, Saturdays, Sundays and holidays shall be excluded in the computation."). The hearing concluded on December 19, 2018. Two holidays were observed between the date the hearing concluded and the date the Board issued its decision, such that the Board produced its written report within ten days. In any case, we conclude that the Board has not acted outside of its jurisdiction and it did not lose competency to issue a written decision.

## CONCLUSION

¶50    We conclude that the Board's decision to discharge Andrade for violating the department's Code of Conduct complied with the proper standard of law. We conclude that judicial estoppel is unwarranted. We also conclude that the Board maintained competency to issue its written decision. For these reasons, we affirm the circuit court.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.

No. 2020AP333(D)

¶51 DUGAN, J. (*dissenting*). Because I believe that Andrade did not receive his full panoply of due process protections—here, an explanation of the Chief's evidence relating to his discharge—I respectfully dissent.[1]

## STANDARD OF REVIEW

¶52 "In general, the scope of our certiorari review is limited to whether the Commission (1) acted within its jurisdiction; (2) proceeded on a correct theory of law; (3) was arbitrary, oppressive or unreasonable; or (4) might have reasonably made the order or finding it made based on the evidence." *Umhoefer v. Police & Fire Comm'n of Mequon*, 2002 WI App 217, ¶12, 257 Wis. 2d 539, 652 N.W.2d

---

[1] As explained below, I disagree with the Majority's conclusion that the fact that the Chief and the Chief Deputy District Attorney both testified extensively at the hearing about the critical importance of being able to serve as a credible witness as a sworn police officer fulfills Andrade's due process rights. The due process issue in this case is not what occurred during the hearing, but rather, whether Andrade received his full panoply of pretermination due process rights—here "an explanation of the [Chief's] evidence." *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 539-41, 546 (1985). As further explained herein, I am also unpersuaded that Andrade's recitation of the SOP on social media during the investigation and his counsel's request for production of a *Brady*/*Giglio* list is sufficient to conclude that Andrade was on notice of the role his ability to testify played in his case. Therefore, I respectfully dissent.

I note that, with respect to other issues on appeal, I agree with the Majority's conclusions that: (1) the hearing officer reasonably ruled that discipline of officers for their conduct involved in the arrest of Sterling Brown, which did not involve the use of social media, was not relevant to Andrade's discipline for his conduct which involved his social media postings; (2) that judicial estoppel does not apply in this case; and (3) that assuming, without deciding, that even if the Board's written decision was untimely under its rules, the ten-day rule is directory—not mandatory.

412.[2] "However, when the trial court has disposed of a [WIS. STAT.] § 62.13(5) direct appeal, our certiorari review is further limited to whether the Commission kept within its jurisdiction and whether it proceeded on a correct theory of law. These are questions of law that we review de novo." *Id.* (footnote omitted; citation omitted).

¶53   As relevant to this dissent, Andrade contends that the Chief violated his due process rights by not providing him an explanation of the evidence that supported his discharge—namely, that the sole reason that he was being discharged was that the Chief Deputy District Attorney, Kent Lovern, said that Andrade could no longer be called as a witness in any criminal case because of his conduct.  I construe Andrade's certiorari argument as addressing whether or not the Board proceeded on a correct theory of law.  *See State ex rel. Wasilewski v. Board of Sch. Dirs. of Milwaukee*, 14 Wis. 2d 243, 263, 111 N.W.2d 198 (1961) (explaining that the rule that the scope of review in certiorari extends to whether the board acted "according to law" refers not only to applicable statutes, but also to guarantees of due process).

## DISCUSSION

¶54   As noted, the issue of whether Andrade received the full panoply of due process protections is what this dissent will discuss.  *Addressing what process is due in the case of a person who has a constitutionally protected property*

---

[2] I note that Andrade initially appealed his discharge on a writ of certiorari and under WIS. STAT. § 62.13(5)(i).  However, the trial court's determination on the statutory review is final and conclusive, and we, therefore, "have no jurisdiction to review that determination." *Umhoefer v. Police & Fire Comm'n of Mequon*, 2002 WI App 217, ¶12, 257 Wis. 2d 539, 652 N.W.2d 412 (citation and one set of parenthesis omitted).

2

*interest,*[3] the United States Supreme Court, *in* ***Cleveland Board of Education v. Loudermill***, 470 U.S. 532 (1985), stated that "[t]he tenured public employee is entitled to oral or written notice of the charges against him, *an explanation of the employer's evidence*, and an opportunity to present his [or her] side of the story." ***Id.*** at 539-41, 546 (emphasis added); *see also* ***Hough v. Dane Cnty.***, 157 Wis. 2d 32, 43, 458 N.W.2d 543 (Ct. App. 1990) (citing ***Loudermill***, 479 U.S. at 532, 546, the court stated, "Because he had a property interest in continued employment, Hough could not be terminated without (1) oral or written notice of the charges against him, (2) *an explanation of the evidence supporting the charges*, and (3) an opportunity to respond to the charges.") (emphasis added)).

¶55    Andrade argues that it was never explained to him that his discharge was based solely on the fact that the Chief Deputy District Attorney stated that Andrade could no longer be called as a witness and that the DA's office would not prosecute any crimes where Andrade would need to be called as a witness.  In other words, that fact was never mentioned, let alone explained to him, when he was given an explanation of the evidence supporting the charges against him.

¶56    As the Majority points out, there is no dispute that the sole reason that the Chief discharged Andrade was because of the Chief Deputy District Attorney's statement that Andrade could no longer be called by the DA's office as a witness.  Majority, ¶¶12, 17.  In his opening statement at the hearing, the Chief's counsel stated that there would be no dispute that the Chief Deputy District Attorney was asked by the Chief's office if there was an issue with Andrade

---

[3] It is undisputed in this case that Andrade had a constitutionally protected interest in his continued employment.

3

testifying as a witness in light of his postings. *Id.*, ¶12. He then stated that the Chief Deputy District Attorney said that the posts would make it impossible for the DA's office to use Andrade as a witness. *Id.* The Majority points out that the Chief's counsel continued to state that the posts were problematic, but the "lynchpin on which the discharge rested was [Andrade's] inability to serve as a witness in criminal cases[.]" *Id.*, ¶13.

¶57 As the Majority notes, the Chief's own testimony clearly shows that the only reason that he discharged Andrade—as compared to disciplining him— was because the Chief Deputy District Attorney said the DA's office could no longer use him as a witness in criminal cases. *Id.*, ¶17. The Chief further testified that without the witness issue Andrade's conduct involving the postings was still "discipline-worthy conduct … [i]t would [have] imposed heavy discipline." But, he added, "I would not have fired him had it not been for his inability to testify in court or be used by the district attorney's office to testify in court." Moreover, in its decision the Board found that

> [the Chief] solicited the opinion of the Milwaukee District Attorney's Office whether Andrade could remain a witness in state criminal cases. The DA's Office informed him it would not permit Andrade to testify because of his Facebook posts and comments. The Chief's decision to discharge Andrade was based on the DA's position that Andrade could not testify credibly and, therefore, would not be permitted to testify.

The Board also found that "[t]he Chief learned from colleagues across the country that the story of the posts was receiving national media coverage …. Nevertheless, the Chief would not have discharged Andrade for his posts and comments; instead, he would have imposed a lesser discipline."

4

¶58 Clearly, the record shows that, but for the allegation that Andrade could not testify in criminal cases, the Chief would not have fired him.

¶59 The issue then becomes whether the Chief gave Andrade "an explanation of the employer's evidence." *See Laudermill*, 470 U.S. at 546. Andrade asserts that no document referenced Andrade's alleged inability to testify as having anything to do with his discharge prior to the termination hearing. The record reflects that neither the thirteen page "Charges" document, nor the five page "Complaint," make any mention of his alleged inability to testify.

¶60 The testimony of Lieutenant David Feldmeier explains why there is no reference to Andrade's alleged inability to testify in any of those documents. He testified that the issue of Andrade's ability to testify was not something the Internal Affairs Division looked into at the time of its investigation of Andrade's conduct. He stated that "[i]t was not something that we specifically looked at, no. That was something that was brought in as a consideration by the Chief's office as to the discipline" after the investigation file was moved over to the Chief's office. Therefore, the issue of Andrade's ability to testify was not a part of the Internal Affairs Division's investigation, which included the notice and explanation of charges and interviews with Andrade.

¶61 The Board does not refute these facts. Rather, the Board argues that Andrade conflates a consequence for violation of a department rule—that he cannot be called as a witness—with notice of the violation itself. The Board contends that not being deemed usable as a witness is not an element of the charge for which Andrade requires notice and it is only a consequence of the violation of the rules. However, the Board then states that Andrade "ignores the actual complaint filed with the Board and the fact that Andrade could not be called as a

5

witness by the DA is itself *evidence* of a failure to inspire and sustain that confidence." (Emphasis added.)

¶62     The Board is correct that the fact that Andrade allegedly could not be called as a witness is not an element that the Chief was required to prove in order to show that Andrade violated the rule, but rather, it is evidence regarding the issue of whether his conduct violated the rule that an officer's conduct must inspire and sustain the confidence of the community.  What the Board ignores is, as noted above, that due process requires that the Chief had to give Andrade not only "notice of the charges against him," but also "an explanation of the [Chief's] evidence."  *See **Laudermill***, 470 U.S. at 546.  Andrade acknowledges that he was given notice of the rules that he is alleged to have violated.  However, his argument is that the Chief did not mention, let alone give him, an explanation of the evidence that proved he violated those rules.  Here, that evidence was that the Chief Deputy District Attorney said that the posts would make it impossible for the DA's office to use Andrade as a witness, and that fact demonstrates that Andrade's conduct failed to inspire and sustain confidence under the rule.

¶63     The record reflects that the Chief identified and explained detailed evidence that supported the charges against Andrade throughout the investigation. The thirteen-page "Charges" document set forth the numerous allegations in a civil action that Sterling Brown filed against various defendants, including Andrade.  The document extensively details the nature of numerous postings on Facebook that Brown alleged Andrade posted.  The Charges document also sets forth Andrade's responses to the various postings.  However, there is no mention in that document of Andrade's ability to be called as a witness. By contrast to the detailed investigation, and identification, and explanation of the evidence regarding the details of the postings, the Internal Affairs Division's investigation

of Andrade did not consider his ability to be called as a witness. The fact that evidence of Andrade's ability to be called as a witness was being considered as a part of the charges against him, let alone that fact that it was the sole basis for his discharge, was never explained to him until the hearing itself.

¶64 The Board next argues that *Laudermill* only requires notice and opportunity to be heard. It never mentions anywhere in its brief that *Laudermill* holds that the "employee is entitled to … an explanation of the employer's evidence[.]" *See Laudermill*, 470 U.S. at 546. The Board's arguments on this point are supported only by general statements, and the Board provides no legal support for its argument that *Laudermill* only requires notice and opportunity to be heard. Because the arguments are undeveloped and lack any legal authority, we do not address them. *See State v. Pettit,* 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

¶65 Lastly, the Board argues that Andrade was given ample notice that his ability to testify would be an issue at his hearing. It notes that the Chief and the Chief Deputy District Attorney who testified regarding Andrade's alleged inability to be called as a witness were disclosed on the Chief's witness list well in advance of the hearing. It also states that an exhibit that was introduced at the hearing, "which Andrade's council demanded and received prior to the hearing, was the District Attorney's list of current and former police officers determined by the DA to be … officers for whom the DA would have an obligation to turn over [exculpatory] information during discovery." It further states that "[t]he list also included comments about several individuals for whom the information was so damaging that the office would no longer call them." The Board asserts that this shows that Andrade had actual notice that the Chief's decision was based on the

Chief Deputy District Attorney's statement that Andrade could not be called as a witness in the future.[4]

¶66    What the Board does not disclose is that the list of witnesses consists merely of the names of the witnesses and does not mention what the witness may testify about.  As to the DA's list of officers described above, Andrade's counsel subpoenaed that list from the Chief Deputy District Attorney the day before he was called to testify by the Chief.  The Chief did not voluntarily disclose the list, it was not disclosed until the day before the Chief Deputy District Attorney was going to testify as the Chief's witness, and the Chief never gave Andrade an explanation of the list.  I conclude that these facts do not constitute compliance with the due process requirement that the "employee is entitled to … an explanation of the employer's evidence[.]"  *See Laudermill*, 470 U.S. at 546.

¶67    Because I believe that Andrade did not receive his full panoply of due process protections—here, an explanation of the Chief's evidence relating to his discharge—I respectfully dissent.

## CONCLUSION

¶68    I conclude that under the facts of this case, Andrade's due process rights required an explanation by the Chief of his evidence that supported his decision to discharge Andrade.  Here, that evidence was that the Chief's decision to discharge Andrade was solely based on the Chief Deputy District Attorney's statement that because of Andrade's posting, Andrade could not be called as a witness in criminal trials in the future, that the Chief believed that a sworn

---

[4]  The Majority was persuaded by this argument.  Majority, ¶37 n.9.

officer's ability to be called as a credible witness in criminal trials is critical to the officer's duties, and evidence that Andrade could not be called as a witness was evidence of Andrade's failure to inspire and sustain confidence. The record clearly shows that the Chief never mentioned, let alone explained, that evidence to Andrade prior to the hearing.

¶69    Thus, I would conclude that the Board's decision should be vacated and the matter be remanded to the Board for further proceedings, consistent with this dissent.